UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK HALL,<br><br>    Plaintiff,<br><br>v.<br><br>RFR HOLDING LLC,<br><br>    Defendant. | Civil Action No.: 1:23-cv-6051<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  Plaintiff, Patrick Hall, by and through his attorneys, The Ottinger Firm, P.C., complaining of Defendant, RFR Holding LLC, alleges as follows:

## INTRODUCTION

  1. Plaintiff Patrick Hall brings this action pursuant to New York Labor Law § 740 for whistleblower retaliation, and pursuant to New York common law for breach of contract. Despite Mr. Hall's years of exceptional performance in his role as Vice President of Hotel Operations, Defendant illegally and maliciously terminated Mr. Hall's employment after Mr. Hall refused to make fraudulent representations regarding Defendant's relationship with Marriott. Furthermore, although Mr. Hall's separation agreement with Defendant requires Defendant to verify Mr. Hall's employment, Defendant has systemically refused to provide even basic information to potential employers. Plaintiff now seeks appropriate monetary and other relief to redress the wrongdoing complained of herein.

## STATEMENT PURSUANT TO LOCAL RULE 9

  2. For purposes of complying with Local Rule 9, Plaintiff states that he has no corporate parent, subsidiary, or affiliate and that there are no other interested parties.

1

## JURISDICTION AND VENUE

3. This case is brought pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and because the amount in controversy exceeds $75,000, excluding attorneys' fees and costs.

4. Plaintiff Patrick Hall ("Plaintiff" or "Mr. Hall") is a citizen of Pennsylvania.

5. Defendant RFR Holding LLC ("Defendant" or "the Company") was and still is a limited liability company in the real estate and hospitality business. Defendant is organized under the laws of the State of New York and its headquarters is located at 375 Park Avenue, New York, NY 10152.

6. Venue is proper in the Southern District of New York because Plaintiff's cause of action arose within this District in that a substantial part of the acts and omissions giving rise to the claims in this case occurred in this District. Venue also is proper in this District because the Defendant is subject to personal jurisdiction therein by virtue of their substantial, continuous, and systematic commercial activities in this District. See 28 U.S.C. § 1391(b), (c). Because the Defendant is subject to personal jurisdiction in this District, it "resides" in this District for venue purposes (see 28 U.S.C. § 1391(c)).

## PARTIES

7. Plaintiff is and was, at all relevant times, a resident of the Commonwealth of Pennsylvania and currently resides in Chadds Ford, PA.

8. Defendant RFR Holding LLC was and still is a limited liability company in the real estate and hospitality business. Defendant is organized under the laws of the State of New York and its headquarters is located at 375 Park Avenue, New York, NY 10152.

9. At all relevant times, Defendant had and still has at least one employee. Therefore,

Defendant is an "employer" for purposes of New York Labor Law § 740.

## STATEMENT OF FACTS

10. Plaintiff Patrick Hall was employed as Vice President of Hotel Operations by Defendant, RFR Realty LLC, from June 2011 until his termination on March 8, 2021.

11. While employed by Defendant, Mr. Hall was frequently recognized for his excellent performance. In 2018, Mr. Hall received a performance bonus equal to 100% of his base salary because of the exceptional results he achieved for the Company. Mr. Hall received the same bonus in 2019. In 2020, Defendant increased Mr. Hall's base salary by 33% in recognition of his sustained pattern of excellence.

12. In or around 2009, the Company signed a 40-year contract with Marriott International, Inc. ("Marriott") to manage the W Hotel Tel Aviv, later renamed to "The Jaffa, "and the W Hotel South Beach, two hotels owned by the Company.

13. On February 23, 2021, Aby Rosen, the Company's co-founder, told Mr. Hall that he wanted to remove Marriott at The Jaffa so that he could bring in a new owner/operator and sell The Jaffa unencumbered. Mr. Rosen asked Mr. Hall to put together talking points to provide to outside legal counsel that specialized in removing hotel management companies. On February 25, Mr. Hall prepared a memorandum that he sent to the Company's in-house legal counsel and the outside counsel.

14. Mr. Hall had a conference with his in-house legal team and outside counsel on February 26, 2021, to formulate a plan to remove Marriott as The Jaffa's management company. During the call, the participants discussed preparing a distorted report of Marriott's performance under the contract to establish that Marriott was grossly negligent in the years 2018 and 2019, two to three years prior, to release the Company from its contract with Marriott and unencumber the

asset. Notably, when The Jaffa reopened in September 2021 after closing for the COVID-19 pandemic, it continued to be operated by Marriott. Additionally, despite the Company's position that Marriott was grossly negligent in their management of the Jaffa, the Company never tried to remove Marriott as the operator of the W Hotel South Beach. Finally, the fact that the Company waited three years to raise its concerns over gross negligence without any attempt to resolve the supposed issues internally confirmed to Mr. Hall that the Company was attempting to fabricate a narrative for purely strategic and financial reasons.

15. Immediately following the call, Mr. Hall called the Company's Associate General Counsel, Rich Froom, to express his concern about authoring a factually inaccurate report. Mr. Hall instructed Mr. Froom not to sign a retainer agreement with outside legal counsel until Mr. Hall had the opportunity to speak with Mr. Rosen.

16. On March 1, 2021, Mr. Rosen requested that Mr. Hall provide a full report containing the misleading and factually inaccurate allegations the Company was leveling against Marriott.

17. The following day, on March 2, 2021, Mr. Hall spoke with Mr. Rosen as well as Tom Lavin, Head of Asset Management, and Frank Mangieri, Chief Legal Officer. During the meeting, Mr. Rosen asked Mr. Hall to put together bullet points highlighting issues or concerns with Marriott so that the Company could establish gross negligence. Mr. Rosen indicated that Mr. Hall would be the Company's chief witness against Marriott in its case to rescind the contract. However, Mr. Hall expressed that he was not comfortable with misconstruing and manipulating the factual record as suggested by Mr. Rosen.

18. In response to Mr. Hall's concerns, Mr. Rosen became aggressive and threatened that Mr. Hall could do as he was asked, or he could resign. Mr. Rosen called Mr. Hall a "coward"

and repeatedly told Mr. Hall, "You work for me and this is the job. Either you do what I say, or you can quit." Mr. Hall never expressed any desire to resign—rather, it was clear that Mr. Rosen would fire Mr. Hall if he did not agree to commit fraud to benefit the Company.

19. After discussing the situation with his wife, Mr. Hall emailed his recollection of the events to Mr. Rosen, Mr. Lavin, and Mr. Mangieri at 10:23 PM the same day. Attached hereto as **Exhibit A** is a true and correct copy of the correspondence Mr. Hall sent to Mr. Rosen, Mr. Lavin, and Mr. Mangieri on March 2, 2021.

20. On March 3, 2021, Mr. Hall received an email from Mr. Mangieri on which Mr. Rosen was copied. In the email, Mr. Mangieri attempted to minimize the seriousness of Mr. Rosen's threats against Mr. Hall and insisted that Mr. Hall was not fired and still had a job. Mr. Mangieri ended his email by indicating that he was happy to discuss the matter further. Mr. Hall responded asking to arrange a phone call with Mr. Mangieri. However, Mr. Hall did not receive a response.

21. The next day, March 4, 2021, Mr. Hall followed up twice with Mr. Mangieri and again with Mr. Rosen but still received no response. Mr. Hall continued to perform his job duties and attended several calls and meetings. Then, Mr. Hall received a call from the Company's CFO, Michael Astarita, to discuss what had transpired with Mr. Rosen. Mr. Astarita represented to Mr. Hall that the Company was under the impression that Mr. Hall had resigned. However, Mr. Hall explained that this contradicted the email sent by Mr. Mangieri on March 3 in which Mr. Mangieri reassured Mr. Hall that he had not been fired and still had a job. At the end of the call, Mr. Astarita asked Mr. Hall what amount he expected for a severance payment. Mr. Hall indicated that while he did not have a specific number in mind, during previous discussions Mr. Rosen had indicated a willingness to provide Mr. Hall with a severance of two years' salary upon his departure from the

Company.

22. Later on March 4, Mr. Hall received an email from the Company's outside legal counsel requesting to discuss the plan to remove Marriott. Mr. Hall responded indicating that he was available all day on March 5 to discuss the plan and forwarded the email to Mr. Mangieri. In the email forward, Mr. Hall explained that he had an idea of how to help the plan. Mr. Mangieri did not respond. The same day, Mr. Froom responded to outside counsel's email indicating that something had come up and the meeting would need to be rescheduled for the following week.

23. On March 8, 2021, Mr. Hall continued to perform his job duties while working remotely. At 10:47 AM, Mr. Hall received an email from Mr. Rosen, addressed to all of the Company's staff, stating that Mr. Hall had officially resigned. Mr. Hall responded immediately indicating that he had not resigned. However, he did not receive a response and shortly thereafter his office email account was disconnected.

24. Despite Mr. Hall's decade of loyal service with RFR, upon his departure the Company offered Mr. Hall no severance package and declined to pay him the prior year's bonus. However, after Mr. Hall obtained legal counsel to negotiate an equitable departure from RFR, he and the Company were able to reach a reasonable resolution.

25. On April 15, 2021, Mr. Hall executed an agreement with the Company (the "Severance Agreement"). Pursuant to Section 4(b) of the Severance Agreement, in response to any third-party request for a reference, the Company shall state Mr. Hall's date of service and title only and make no further comment. Attached hereto as **Exhibit B** is a true and correct copy of the Severance Agreement.

26. Since April 2021, Mr. Hall has been unable to secure employment despite his credentials and experience. Several companies and/or recruiters have indicated to Mr. Hall that

they have attempted a verification of employment for Mr. Hall's time with the Company, but the Company has been entirely nonresponsive. Because the Company refuses to verify Mr. Hall's employment, Mr. Hall has been eliminated from contention for numerous job opportunities without a chance for his candidacy to be fully considered on the merits.

27. Additionally, Mr. Hall employed a private investigation agency to determine whether the Company was not responding to employment verifications. A private investigator called the Company to verify that Mr. Hall had been employed at the Company. A representative from the Company answered the phone and transferred the investigator to Beth Santos. Ms. Santos did not answer the phone call and the investigator left a voicemail explaining that she was conducting an employment verification and provided a callback number. The Company did not return the investigator's call to verify that Mr. Hall was employed as Vice President of Hotel Operations from June 2011 to March 2021, in violation of the Severance Agreement.

28. Upon information and belief, the Company has engaged in a practice of failing to verify Mr. Hall's employment, which has greatly impacted his attempts to find similar or comparable employment.

29. Given the relatively small number of equivalent opportunities available to Mr. Hall, the Company's failure to perform a verification of employment, as required under the Severance Agreement, has essentially rendered Mr. Hall unemployable in the hospitality industry.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

30. Plaintiff realleges and incorporates by reference the foregoing paragraphs.

31. Plaintiff and Defendant executed the Severance Agreement, attached hereto as **Exhibit B**, on April 15, 2021.

32. Pursuant to the terms of the Severance Agreement, Defendant is to provide

employment verification to third parties by specifying Plaintiff's dates of service and employment. Defendant is further contractually obligated not to make any further comment or disparaging remarks regarding Plaintiff to such third parties.

33. Defendant's contractual obligations to verify Plaintiff's employment and not to make any disparaging remarks about Plaintiff to potential employers are material. Employment verifications are critical for Plaintiff to secure employment, and Plaintiff would not have executed the Severance Agreement unless Defendant had agreed to be bound by these obligations.

34. Plaintiff has performed all contractual obligations due to Defendant under the Severance Agreement.

35. By reason of the actions and inactions of Defendant, whereby Defendant has failed to satisfy its contractual obligations to Plaintiff by refusing to verify Plaintiff's employment with the Company, Plaintiff has suffered and continues to suffer economic loss; he has been damaged in his profession; he was made emotionally and physically ill; he suffered and continues to suffer damage to his reputation among his peers; embarrassment; humiliation and was otherwise greatly injured.

36. By reason of the foregoing, Plaintiff has become entitled to an award of compensatory and punitive damages in an amount to be determined by a jury at trial, together with costs and disbursements, attorneys' fees, and appropriate interest.

## SECOND CAUSE OF ACTION
**(Violation of Whistleblower Protection Law, New York Labor Law § 740)**

37. Plaintiff realleges and incorporates by reference the foregoing paragraphs.

38. Plaintiff alleges that the complained of actions violate New York Labor Law § 740 in that Defendant unlawfully retaliated against Plaintiff for his refusal to engage in illegal activity.

39. On or about March 2, 2021, Defendant instructed Plaintiff to make material

misrepresentations of fact regarding Marriott's performance under its management contract with Defendant.

40. Plaintiff informed Defendant that the representations of fact that it wanted Plaintiff to attest to were false, and therefore Defendant knew of their falsity.

41. Defendant insisted that Plaintiff make such material representations in order to defraud Marriott and/or the judicial system so that Defendant could exit its unfavorable management contract with Marriott.

42. Further, Defendant instructed Plaintiff that he would be the Company's primary witness and told Plaintiff that he would need to make the material representations regarding Marriott's performance under oath.

43. The actions that Defendant required Plaintiff to perform were illegal in that they constitute fraud in violation of New York common law and/or perjury in violation of New York Penal Law §§ 210.05, 210.10, and/or 210.15.

44. Plaintiff refused to engage in the illegal activity required of him by Defendant.

45. As a result of Plaintiff's refusal to engage in illegal activity, Defendant retaliated against Plaintiff by terminating his employment in violation of New York's Whistleblower Protection law.

46. Although the Severance Agreement contains a release of claims related to Plaintiffs employment with Defendant, Defendant has materially breached the Severance Agreement by failing to satisfy its contractual obligation of providing employment verification for Plaintiff and/or by making disparaging remarks about Plaintiff to potential employers. Accordingly, Plaintiff is no longer bound by the release of claims contained in the Severance Agreement.

47. By reason of the actions and inactions of Defendant, whereby Defendant has

engaged in unlawful employment practices, Plaintiff has suffered and continues to suffer economic loss; he has been damaged in his profession; he was made emotionally and physically ill; he suffered and continues to suffer damage to his reputation among his peers; embarrassment; humiliation and was otherwise greatly injured.

48. By reason of the foregoing, Plaintiff has become entitled to an award of compensatory and punitive damages in an amount to be determined by a jury at trial, together with costs and disbursements, attorneys' fees, and appropriate interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

(1) That the Court order and declare that Defendant is in breach of the Severance Agreement and that Defendant's actions and practices, complained of herein, are in violation of Plaintiff's rights as secured by New York Labor Law § 740;

(2) That the Court award Plaintiff the following relief:

[a] Actual damages for loss of any compensation, including wages, salary, bonuses and benefits, in an amount to be determined at trial, plus interest;

[b] Compensatory damages in an amount to be determined at trial, for humiliation, mental anguish, emotional distress, and other damages sustained by Plaintiff;

[c] Punitive damages in an amount to be determined at trial; and

[d] Reasonable attorneys' fees, expert fees, costs and disbursements.

(3) Such other relief that this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and claims with respect to which they have a right to jury trial.

Dated: July 13, 2023
New York, New York

Respectfully submitted,

**THE OTTINGER FIRM, P.C.**

By: _____
Robert W. Ottinger
79 Madison Avenue
New York, NY  10016
robert@ottingerlaw.com
Tel: 347-492-1904

*COUNSEL FOR PLAINTIFF*

11